# UNITED STATES DISTRICT COURT

for the

Eastern District of California

**FILED**

**Nov 20, 2020**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

In the Matter of the Search of )
)
2000 CLAY BANK ROAD APARTMENT R7, )
FAIRFIELD, CALIFORNIA 94533 )
)

Case No.   2:20-sw-1073 CKD

**SEALED**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A-2, attached hereto and incorporated by reference.**

located in the _____Eastern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in possession of a firearm |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

- ☑ Continued on the attached sheet.
- ☐ Delayed notice ___30___ days (give exact ending date if more than 30 _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/
_____
*Applicant's signature*

Christopher Bailey, ATF Special Agent
*Printed name and title*

Sworn to me and signed via telephone.

Date: __November 20, 2020 at 11:21 am__

_____
*Judge's signature*

City and state:  Sacramento, California

Carolyn K. Delaney, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

I, Christopher Bailey, being first duly sworn, hereby depose and state as follows:

## I.   INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for search warrants for the following person, residences, and vehicles under Federal Rule of Criminal Procedure 41.

- The person of Michael Ray Pitre, DOB: XX/XX/1985 ("PITRE")
- The residence located at 120 Kemper Street, Vallejo, California ("SUBJECT PREMISES 1");
- The residence located at 2000 Clay Bank Road #R7, Fairfield, California ("SUBJECT PREMISES 2");
- The vehicle, 2004 Dodge Ram, California license plate 7N66889, VIN# 1D7HA18D44S771476 ("SUBJECT VEHICLE 1");
- The vehicle, 2011 Toyota Camry, California license plate 8MVU345, VIN# 4T1BK3EK2BU119657 ("SUBJECT VEHICLE 2");
- The vehicle, 2011 Toyota Camry, California license plate 6LEA286, VIN# 4T1BF3EK3BU125245 ("SUBJECT VEHICLE 3")

2.     I have been employed as a Special Agent with ATF since February 2009.  I am presently assigned to the ATF Oakland Field Office in Oakland, California.  I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7).  I am a graduate of the Criminal Investigator Training Program at the Federal Law Enforcement Training Center and Special Agent Basic Training at the ATF National Academy.  The training that I received at the academy included formalized instruction in, among other things: firearms, drugs, and violent crime-related investigations, familiarization with United States firearms laws, financial investigations and money laundering, identification and seizure of drug and firearms tracking related assets, physical and electronic surveillance, weapon qualification and tactics, operation and use of confidential sources, and undercover operations.  Prior to working as an ATF Special Agent, I worked as an industry operations investigator for the ATF and investigated federal firearm and explosive licensees, including manufacturers, importers, and dealers of firearms, for compliance with the Gun Control Act and the

Code of Federal Regulations.

3.      As an ATF Special Agent, I have conducted and participated in both state and Federal investigations involving the illegal possession and trafficking of firearms.  I have investigated and assisted in the prosecution of criminal street gangs engaged in illegal narcotics and firearms trafficking. During these investigations, I have participated in and/or served as the primary case agent in cases involving various types of investigative techniques, including the use of electronic surveillance, assistance from undercover agents and informants, and the controlled purchases of firearms and narcotics from suspects.  I have also participated in physical surveillance operations and the execution of state and federal arrest warrants and search warrants, resulting in state and federal prosecution of defendants.  In addition to utilizing the aforementioned investigative techniques, I have been required during these investigations to analyze information resulting from traditional record searches, pen registers and trap and trace devices, financial records, utility records, and telephone toll and subscriber records.  My work with informants and cooperators has involved, among other things, monitoring meetings and recorded conversations, and generally evaluating the reliability and truthfulness of an informant/cooperator.  Because of my training and experience, I have become familiar with the manner in which illegal firearm and drug traffickers smuggle, transport, store, conceal, and distribute firearms and drugs, as well as how they collect and launder proceeds related to such activities.  I am also familiar with the manner in which these individuals use telephones, coded communications, false or fictitious identities, and other means to facilitate illegal activities and thwart law enforcement investigations.  I have also consulted and discussed these investigations with other law enforcement officers and agents who are experienced in these types of investigations.

4.      Based on the facts set forth below, I believe that PITRE has violated, is violating, and will continue to violate 18 U.S.C. § 922(g)(1) (the "Target Offense") in that he has and continues to possess firearms after previously having been convicted of a felony offense.  This Affidavit therefore requests authority to search the person, locations, and vehicles described in Attachment A in order to locate and seize the items described in Attachment B as evidence of violations of 18 U.S.C. § 922(g)(1), Felon in Possession of a Firearm and/or Ammunition.

5.      This affidavit is intended to show only that there is sufficient probable cause for the

1  requested warrant and does not set forth all of my knowledge about this matter.

2  **II.     PROBABLE CAUSE**

3      6.     As indicated below, I believe that PITRE regularly possesses firearms and is likely to

4  currently be in possession of firearms and/or ammunition, despite his status as a convicted felon.

5      **PITRE's Criminal History**

6      7.     I reviewed PITRE's criminal history and found that he has multiple felony convictions,

7  including two 2008 robbery convictions for violations of California Penal Code 211; a 2015 burglary

8  conviction for violation of California Penal Code 459-460(A); and a 2019 parole violation conviction for

9  violation of California Penal Code 3000.08.  Additionally, PITRE has been arrested and charged for

10 possession of firearms on multiple occasions (these charges appear to have been dismissed per plea

11 agreements).  PITRE also has a 2014 arrest for murder, in violation of California Penal Code 187(a).

12     **2019 HSI Investigation into PITRE's Purchase of Machineguns**

13     8.     On or about March 9, 2019, Customs and Border Protection (CBP) personnel discovered

14 a parcel containing six Glock type machinegun conversion devices, often referred to as "Glock

15 Switches."  I know, based on my training and experience, that these devices are both "firearms" as

16 defined in 26 U.S.C. 5845(a) and "machineguns" as defined in 26 U.S.C. 5845(b).[1]  The parcel arrived

17 at the San Francisco Airport (SFO) mail facility from China and was addressed to "Michael Pitre" at

18 "4933 Parkgreen Circle, Antioch, CA 94531."  The six machinegun conversion devices were seized as

19 contraband by CBP on March 18, 2019.

20     9.     HSI agents initiated an investigation into PITRE and discovered that he was a convicted

21 felon currently on parole with a search clause.  PITRE's parole address of record was listed as 3818

22 Barrett Avenue, Richmond, California.  4933 Parkgreen Circle was determined to be the residence of

23 S.M., PITRE's wife/ex-wife and mother of his children.

24     10.    On or about April 4, 2019, a federal search warrant was conducted at 4933 Parkgreen

25 Circle, Antioch, California.  S.M. was contacted at the residence however PITRE was not present.

26 During a search of the residence, agents discovered numerous items of indicia for PITRE along with

27 ─────────────

28     [1] I have not examined these devices, but state my opinion based on my review of HSI reports
regarding the investigation.

5.56mm caliber ammunition, a ski mask, a pistol holster, and an empty case for a Glock model 30 .45 caliber pistol, serial number CKD156US.  Among the items of indicia were PITRE's California driver's license, CDCR inmate ID card, and other mail addressed to PITRE at 4933 Parkgreen Circle.  Additionally, inside a safe which S.M. claimed PITRE had no access to, agents found indicia in the form of an earnings statement for PITRE and his CDCR progress report.

11.     During an interview, S.M. advised that PITRE had never actually lived there even though indicia was discovered with his name on it and he utilized the address for his California driver's license.  S.M. indicated that the last time PITRE had been at the residence was on March 31, 2019, when he had come to retrieve a package which he had sent to the house.  She described the package as having Asian markings on it.

12.     Simultaneously, HSI and CDCR personnel conducted a parole search at 3818 Barrett Avenue, Richmond, California.  PITRE was not present at the residence even though it was his active parole address.  Agents were advised that PITRE had been staying with his mother in Vallejo.

13.     HSI agents and CDCR personnel then traveled to SUBJECT PREMISES 1 in an attempt to contact PITRE.  Agents knocked on the door, which was eventually answered by PITRE's mother, V.P.  PITRE was present at SUBJECT PREMISES 1 and appeared to have been sleeping on the couch.  Law enforcement personnel noted that PITRE was located immediately adjacent to the front door on which they had been knocking.  Notably, PITRE had motion activated cameras which alerted to his phone, and yet he had still not answered the door.

14.     During an interview of PITRE, he was asked about ordering gun parts.  PITRE stated that the only thing he could think of was that he had ordered magazines for his cousin, K.G.  PITRE advised that he drove a black Toyota Camry (SUBJECT VEHICLE 3) and a blue truck, which had belonged to his father (SUBJECT VEHICLE 1).  According to HSI reports, when asked about the recent ordering of six "Glock auto selector switches," PITRE said that he probably ordered them.

15.     According to HSI reports, PITRE's parole was violated for failure to report a change of address, being out of county, having access to a firearm, and having access to ammunition.

//

//

AFFIDAVIT

4

**Homicide of J.R.**

16.     On October 20, 2019, Oakland Police Department (OPD) officers responded to 3302 Laguna Way, Oakland, California for a report of shots fired and a vehicle running in the middle of the roadway.  Upon arrival, officers observed J.R. (the "homicide victim") inside his vehicle with multiple apparent gunshot wounds to the head.  The homicide victim was pronounced dead on scene.  Officers recovered a 9mm pistol on the floorboard of the vehicle.  Two fired .357 caliber cartridge cases were recovered on the street just south of the victim's vehicle.  The investigation into this homicide is ongoing.

17.     The victim's aunt provided OPD investigators with the homicide victim's cellular phone number.  A state search warrant was obtained for call detail records for the homicide victim's phone and a search of its contents.  A review of these records showed that the last two phone calls made by the homicide victim prior to his death were to phone number 916-613-2514, which was later determined to belong to his cousin, E.J.  A search of the homicide victim's phone showed this number assigned contact "Cuzzin E."  Shortly before the homicide victim's death, the victim also exchanged a text message conversation with this number indicating that they planned to meet:

Cuzzin E: "Im Drivin im call u bak n a min"

Homicide victim: "Wya"

Cuzzin E: "I'm about 2 leave Stockton dropin my b**** sister off"

Cuzzin E: "It's no goin take lng 2 get bak 2 da east"

Homicide victim: "Yup hit me when you get out here"

Cuzzin E: "Alrite"

Cuzzin E: "My bm blowin my phne up rite nw 2"

18.     During a search of the homicide victim's phone, detectives observed that phone number 209-271-7639 (later identified as PITRE's phone) had been created as contact "Mp" on October 18, 2019.  The homicide victim made two outgoing phone calls to this number approximately three hours prior to the murder.  According to phone records, 209-271-7639 received a phone call and was present in the area approximately one minute prior to the murder.  Subscriber records show the phone number subscribed to "Mac Tee" at 4933 Parkgreen Circle, Antioch, California.

19.    A state search warrant was also obtained for a "cell tower dump" to identify cellular devices in the area at the time of the murder.  Comparison between the tower dump and call detail records for the victim's phone showed phone number 209-271-7639 in common.

20.    Further analysis of tower dump data showed that, around the time of the murder, phone contacts were made between phone numbers 510-375-4004 and 510-224-0252, and that one of these numbers was present in the area at the time of the murder.  Commercial database queries showed these numbers associated with B.B. and V.P., respectively.  Call detail records with cell site data for both phones were received pursuant to a state search warrant.  These records showed that phone number 510-224-0252, subscribed to V.P. at SUBJECT PREMISES 1, was in fact in the area around the time of the murder.  Analysis for phone number 510-375-4004, subscribed to B.B, showed that the phone was in the area of Suisun City around the time of the murder.  B.B. is believed to be PITRE's girlfriend, who resides at SUBJECT PREMISES 2.

**November 20, 2019 Interview of E.J.**

21.    On November 20, 2019, OPD detectives interviewed E.J. and D.R. (the victim's aunt).  When initially asked, E.J. stated that he had last spoken to the homicide victim several days before the murder.  When detectives advised that phone records showed that the homicide victim's last communications were to E.J., he recalled that they intended to meet that evening, but that E.J. changed his mind.

**December 19, 2019 Arrest of Michael Pitre**

22.    On December 19, 2019, OPD officers responded to the area of 2230 84th Avenue, Oakland, California for reports of a group of males blocking the street and of one being armed with a handgun.  Upon arrival, officers observed PITRE near two vehicles.  When officers approached, they observed a firearm on the seat of a Jeep in the driveway.  PITRE was detained due to the observation of a firearm in plain view as well as a second during a probable cause search of the Jeep, which was in close proximity to him.  While being detained, PITRE made spontaneous statements about owning the Toyota Camry (SUBJECT VEHICLE 3) parked perpendicular to the Jeep.  Officers then discovered a third firearm underneath SUBJECT VEHICLE 3 near where PITRE had been squatting down on their arrival.  Officers were later able to view surveillance video from the area, which showed what appeared

to be PITRE hiding the firearm underneath SUBJECT VEHICLE 3.  SUBJECT VEHICLE 3 was

determined to be registered to S.M. at 4933 Parkgreen Circle, Antioch, California.

23.    The firearm seized from underneath SUBJECT VEHICLE 3 was determined to be a

Glock model 31C .357 caliber pistol bearing serial number LKP180.[2]  The firearm was loaded with

ammunition bearing head stamp "SPEER 357 SIG."  Per OPD homicide records, this matches the

ammunition head stamps for the fired cartridge cases recovered at the homicide scene.

24.    During PITRE's arrest, three phones were recovered inside SUBJECT VEHICLE 3.

Subscriber information for phone number 209-271-7639 showed that it was utilized by a cellular device

with IMEI 355685074002253.  This IMEI was determined to be assigned to an Apple iPhone model

A1633 recovered inside SUBJECT VEHICLE 3.  A state search warrant to search the contents of the

recovered phone confirmed this information.  Subscriber information for phone number 510-224-0252

showed that it was utilized by a cellular device with IMEI 352334102257257, which corresponds with a

Samsung Galaxy S10 also recovered in PITRE's vehicle.

**February 20, 2020 Interview of Michael Pitre**

25.    On February 20, 2020, OPD detectives interviewed PITRE at Santa Rita Jail.  PITRE was

advised of his Miranda rights, which he indicated he understood and agreed to speak with detectives.

PITRE advised that during 2019 he lived with his mother at SUBJECT PREMISES 1.  PITRE claimed

to have a Mercedes C Class (believed based on HSI reports to be S.M.'s) and a Dodge Hemi truck

(believed to be SUBJECT VEHICLE 1).  He also indicated that he used two Toyota Camrys belonging

to his wife and to his mother (SUBJECT VEHICLE 2 and SUBJECT VEHICLE 3).

26.    PITRE was shown a photograph of the homicide victim, whom he stated he did not

recognize.  When told that his name was in the homicide victim's phone, PITRE stated that he could

have sold the homicide victim some marijuana.  PITRE further indicated that he barely knew the

homicide victim and must have sold him some marijuana because he could not think of any other reason

why he would have been around Coolidge Avenue.  PITRE denied any involvement in the murder of the

---

[2] Preliminary ballistic analysis using the National Integrated Ballistic Identification Network (NIBIN) of test-fired cartridge cases from the firearm compared to fired cartridge cases from the homicide victim murder scene indicated that this firearm was not used in the murder.

1  homicide victim.

2  **June 11, 2020 Interview of a Source of Information**

3  27.   On June 11, 2020, OPD detectives interviewed a Source of Information (SOI).[3]  The SOI

4  advised that the homicide victim had gotten into a dispute with "Tommy" aka "Savage" (later identified

5  as T.G.).  According to the SOI, the dispute happened approximately one week prior to the murder and

6  included T.G. pulling a firearm on the homicide victim.  The SOI stated that T.G. is related to E.J.'s

7  wife.

8  28.   According to the SOI, on or about October 8, 2019, the homicide victim pulled up at 84th

9  Avenue and Bancroft Avenue where he saw T.G.  The SOI stated that T.G. gave the homicide victim

10  "fair warning."  The SOI further stated that the homicide victim left and returned approximately fifteen

11  minutes later and T.G. had been joined by additional males.  One of these males was a heavy-set Black

12  male with braided dreadlocks matching PITRE's description.  The SOI later identified this person as

13  PITRE.

14  29.   The SOI advised that she believed that the homicide victim would have agreed to meet

15  with T.G. to "clear the air" due to their (the homicide victim and T.G.) previous relationship.  The SOI

16  identified a photograph of PITRE as the individual present during the altercation on or about October 8,

17  2019 and who the SOI believes is who T.G. directed to murder the homicide victim.

18  **Social Media**

19  30.   I have reviewed the publicly viewable Instagram account "watch_the_one_nexttoyou"

20  and recognize the user of the account to be PITRE.  I have also observed that PITRE is followed by

21  accounts that I recognize to be used by both B.B. (Instagram account "venomelace8") and T.G.

22  ("iceking_sav").

23  **Confidential Informant Observations**

24  31.   On or about May 13, 2020, I spoke with an ATF confidential informant (CI).[4]  The CI

25  _____

26  [3] The SOI was previously in a romantic relationship with the victim.  Per other interviews, the
    SOI's family members may also have had disputes with the victim.  The SOI has an arrest for domestic
    violence and assault with a deadly weapon (not a firearm), with no felony or misdemeanor convictions.

27  [4] The CI is providing information to law enforcement for monetary consideration.  The CI has
28  provided information leading to the arrest and prosecution of multiple defendants.  The CI has no felony
    convictions and to my knowledge has not provided information as an informant that was false or

1   advised that he/she knew PITRE.  The CI stated that he/she knew PITRE to be in possession of firearms

2   and to be involved in multiple shootings.

3       32.    The CI advised that PITRE resided with his mother at SUBJECT PREMISES 1 and that

4   he drove a charcoal grey Toyota Camry (SUBJECT VEHICLE 2) and a blue truck, which had belonged

5   to his father (SUBJECT VEHICLE 1).

6       33.    The CI described conversations with PITRE during which PITRE took responsibility for

7   various shootings either directly or indirectly.  For example, the CI described one shooting, which he/she

8   knew occurred in 2019 around School Street and Coolidge Avenue in Oakland, California.[5]  According

9   to the CI, PITRE said something to the effect of "I did that."

10      34.    On or about September 16, 2020, the CI advised that he/she had observed PITRE in

11  possession of an AR-15 type pistol/rifle as well as approximately three or four Glock pistols over the

12  past several days.  The CI further advised that the firearms were observed both inside SUBJECT

13  PREMISES 1 and in SUBJECT VEHICLE 2.  Additionally, the CI stated that PITRE claimed the AR-15

14  to be a fully automatic machinegun.

15      35.    The CI also stated that PITRE indicated that he was sometimes staying with his girlfriend

16  in Vacaville.  Based on the fact that B.B.'s phone number was noted by OPD detectives as one of

17  PITRE's most commonly called phone numbers from Santa Rita Jail, I researched B.B. to ascertain the

18  location of her residence.  Based on her California driver's license address, she resides at SUBJECT

19  PREMISES 2 in the city of Fairfield, which is next to Vacaville.

20      **Subject Premises 1**

21      36.    SUBJECT PREMISES 1 is the residence of PITRE's mother.  It is also the registration

22  location of two vehicles he is known to drive, SUBJECT VEHICLE 1 and 2.  Additionally, PITRE was

23  found to be living at SUBJECT PREMISES 1 in violation of his parole in 2019 and SUBJECT

24  PREMISES 1 has also been identified by the CI as PITRE's primary residence.

25      37.    On July 3, 2020 and July 23, 2020, SUBJECT VEHICLE 3 was read by a license plate

26  _____
    intentionally misleading.

27      [5] The CI described the time period as April or May of 2019, however Laguna Way is a one-block
    street located just north of the School/Coolidge intersection.  The homicide victim's murder is the only
28  homicide I have found, which appears to fit the description.

AFFIDAVIT                                    9

reader parked in front of SUBJECT PREMISES 1.

38.     On August 19, 2019, SUBJECT VEHICLE 1 was read by a license plate reader parked on the street across from SUBJECT PREMISES 1.  SUBJECT VEHICLE 1 is also shown parked in the driveway of SUBJECT PREMISES 1 in a "Google Street View" photograph captured March 2019.

39.     On October 6, 2020 and October 12, 2020, SUBJECT VEHICLE 2 was read by a license plate reader parked in front of SUBJECT PREMISES 1 during the early morning hours.

40.     On October 12, 2020 at approximately 9:00 a.m., surveillance units observed SUBJECT VEHICLE 1 and SUBJECT VEHICLE 2 parked at SUBJECT PREMISES 1.

41.     On October 28, 2020 at approximately 8:30 a.m., I observed SUBJECT VEHICLE 1 parked on the street directly in front of SUBJECT PREMISES 1.  The truck was parked on the curb with orange cones placed in front and behind the vehicle.  I believe the cones are used to hold this parking spot for the vehicle when it is driven.

42.     On November 11, 2020 at approximately 6:55 p.m., surveillance units observed SUBJECT VEHICLE 1 and 2 parked at SUBJECT PREMISES 1.  On November 12, 2020 at approximately 8:55 a.m., both vehicles were still parked at SUBJECT PREMISES 1.

**Subject Premises 2**

43.     SUBJECT PREMISES 2 is the residence of B.B.  B.B. is one of PITRE's top callers from Santa Rita Jail and believed to be his current girlfriend.  PITRE's Toyota Camry, SUBJECT VEHICLE 2, was read by license plate readers parked in the area of SUBJECT PREMISES 2 in the early morning hours of August 28, 2020, September 3, 2020, and October 1, 2020.

44.     On or about September 28, 2020, I reviewed a post to PITRE's Instagram account, which appeared to have been posted the day before.  The video post depicted PITRE inside a vehicle, believed to be SUBJECT VEHICLE 2.  In the video, I observed two juvenile females, whom I believe to be his children.

45.     Additionally, the CI advised that PITRE claimed to be staying part time with his girlfriend in Vacaville, which is next to Fairfield.  Based on my training and experience I know that those involved in criminal activity are often hesitant to give too much information regarding their residences, even to those closest to them.

46.     On October 28, 2020 at approximately 8:50 a.m., I observed SUBJECT VEHICLE 2 and SUBJECT VEHICLE 3 parked on the street directly in front of SUBJECT PREMISES 2.  The vehicles were parked on each side of the southern-most gated vehicle entry driveway to the apartment complex.  I entered the complex and reviewed the complex map, which indicated that building R is the first building north of the driveway adjacent to Clay Bank Road.  Apartment 7 (SUBJECT PREMISES 2) is the southern-most unit on the second floor facing Clay Bank Road.

47.     At approximately 9:15 a.m., I observed someone who I believe to be B.B. exit SUBJECT PREMISES 2 and talk on the phone for approximately five minutes before returning inside.  At approximately 9:45 a.m., I observed B.B. exit SUBJECT PREMISES 2 and walk around the building, out of sight.  At approximately 9:54 a.m., I observed PITRE exit SUBJECT PREMISES 2 and walk around the building in the same direction.  Shortly thereafter, PITRE returned carrying a large box along with B.B, and both entered SUBJECT PREMISES 2.

48.     At approximately 10:32 a.m., Task Force Officer (TFO) Hoang observed B.B. exit SUBJECT PREMISES 2, enter SUBJECT VEHICLE 3, and depart the area.  At approximately 12:38 p.m., TFO Hoang observed B.B. return in SUBJECT VEHICLE 3 and park with the hazard lights on near the pedestrian entry gate to the complex.  He then observed two juvenile females (believed to be PITRE's children as compared to the video referenced above) exit SUBJECT PREMISES 2 and retrieve what appeared to be groceries from SUBJECT VEHICLE 3.  B.B. then parked the vehicle and all three parties entered SUBJECT PREMISES 2.

**Subject Vehicles**

49.     SUBJECT VEHICLE 1 and 2 are both registered to PITRE's mother, V.P.  SUBJECT VEHICLE 1 has been read by license plate readers in front of PITRE's residence at SUBJECT PREMISES 1.  SUBJECT VEHICLE 2 has been read at what is believed to be his girlfriend's residence at SUBJECT PREMISES 2.  SUBJECT VEHICLE 1 and 2 have also been read multiple times recently by license plate readers in the city of Antioch, California where PITRE's children live.

50.     The CI identified SUBJECT VEHICLE 1 and 2 both as being driven by PITRE multiple times as recently as September 2020.

51.     SUBJECT VEHICLE 3 is registered to PITRE's children's mother, S.M., at the address

he was sending Glock machinegun conversion devices during the HSI investigation.  PITRE also

previously admitted to utilizing SUBJECT VEHICLE 1 and SUBJECT VEHICLE 3.  SUBJECT

VEHICLE 3 has also been read by license plate readers at SUBJECT PREMISES 1 as recently as July

23, 2020. As discussed above, on October 28, 2020, surveillance units observed B.B, PITRE's

girlfriend, driving SUBJECT VEHICLE 3 instead of PITRE's ex-wife/registered owner, S.M.

### Training and Experience Regarding Firearms

52.    I know from my training, experience, and discussions with other experience law

enforcement officials that those who illegally possess, manufacture, and/or traffic in firearms frequently

possess the following evidence of their unlawful activity in their residences, places of employment,

storage units, vehicles, electronic devices, and on their persons:

a)    Firearms, lower receivers, upper receivers, grips, stocks, magazines, magazine

repair kits, trigger assemblies, variant lower receivers, and barrels;

b)    Information concerning where and from whom the person purchased firearms or

firearm parts;

c)    Information concerning where and to whom firearms or parts were sold or

transferred;

d)    Correspondence to and/or from actual or prospective sources or buyers;

e)    Records and/or documents of mailings, shipping or delivery, whether by the

United States Postal Service or other private delivery services;

f)    Information concerning methods used to advertise the availability of their

firearms or firearm parts for purchase;

g)    Photos of their firearms or firearm parts

h)    Written, recorded oral, or digital communications with associates involved in the

purchase/sale of firearms or firearm parts;

i)    Written statements showing profits made from the sale of firearms or firearm

parts

j)    Electronic devices, including cellular telephones, tablets and computers, used to

communicate regarding firearms transactions, conduct related research, and maintain records of

the purchase and sale of firearms.

53.     I also know, based on my training and experience, that:

a)      Individuals who illegal possess firearms often store firearms, ammunition, firearm parts, gun boxes, receipts for firearms and other firearm related paraphernalia at residences and inside vehicles.  Because firearms and ammunition are used for protection, individuals will store these items in readily accessible locations, including at their residences, inside their vehicles and on their person.  Specifically, handguns (pistols and revolvers) may be stored in smaller locations such as dresser drawers and glove compartments because of their size and easy access.  In addition, firearms and ammunition are sought after by convicted felons and/or individuals unable to legally purchase them otherwise, and unlike narcotics, firearms, and ammunition are not consumable items.  Furthermore, individuals possess firearms and ammunition for long periods of time because they are durable goods and their monetary worth will often remain the same.

b)      Those involved in illegal firearms possession will often store firearms and ammunition in various different places and may often move these locations so as to avoid discovery by law enforcement.  In addition to their actual residence and vehicle these locations may be the residences belonging to girlfriends/boyfriends, mother/father of their children, and vehicles registered in others names.

c)      Those who illegally possess firearms often, intentionally or unintentionally, retain paperwork and evidence indicating the source of that firearm whether it be by purchase, theft, or other means.

d)      Those involved in illegal firearms possession often utilize electronic devices to communicate with sources and buyers of firearms.  They will often send photographs and or descriptions of firearms for sale through text message, email, or other third party applications.  Additionally, they will also often discuss the prices for the sale of said firearms.

e)      I know that firearm traffickers and/or manufacturers, as well as criminal co-conspirators generally, use cellular telephones to communicate with one another, either by voice or text message.  Cellular telephones are digital devices that preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the telephone numbers of

other firearm traffickers and/or manufacturers and the dates and times that they and/or the mobile

telephone user dialed one another's telephones. Cellular telephones also contain in their memory

a telephone book. This allows the user to store telephone numbers and other contact information;

the information stored in a telephone used by firearm traffickers and/or manufacturers is

evidence of the associations of the firearm traffickers and/or manufacturers, some of which are

related to his or her illegal business. Cellular telephones also contain in their memory text

messages sent, received, and drafted by the mobile telephone user. The text message history of a

firearm traffickers and/or manufacturer's mobile telephone can contain evidence of firearm

trafficking and/or manufacturing because it shows the communications or planned

communications of a firearm trafficker and/or manufacturer and the telephone numbers of those

with whom the firearm trafficker and/or manufacturer communicated or intended to

communicate. Firearms traffickers and/or manufacturers sometimes leave voice messages for

each other and this is evidence both of their mutual association and possibly their joint criminal

activity. Cellular telephones can also contain other user-entered data files such as "to-do" lists,

which can provide evidence of crime when used by firearm traffickers and/or manufacturers.

Cellular telephones can also contain photographic data files, which can be evidence of criminal

activity when the user was a firearms trafficker who took pictures of evidence of crime. Cellular

telephone companies also store the data described in this paragraph on their own servers and

associate the data with particular users' mobile telephones.

### III.   <u>TECHNICAL TERMS</u>

54.   Based on my training and experience, I use the following technical terms to convey the

following meanings:

a)   IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric

address used by computers on the Internet.  Typically, an IP address looks like a series of

four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Other

forms of IP addresses, such as IPv6, may express IP addresses differently.  Every

computer attached to the Internet must be assigned an IP address so that Internet traffic

sent from and directed to that computer may be directed properly from its source to its

1    destination.  Most Internet service providers control a range of IP addresses.  Some

2    computers have static—that is, long-term—IP addresses, while other computers have

3    dynamic—that is, frequently changed—IP addresses.

b)   Internet: The Internet is a global network of computers and other electronic devices that

communicate with each other.  Due to the structure of the Internet, connections between

devices on the Internet often cross state and international borders, even when the devices

communicating with each other are in the same state.

c)   Storage medium: A storage medium is any physical object upon which computer data can

be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-

ROMs, and other magnetic or optical media.

## IV.      COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

55.    As described above and in Attachment B, this application seeks permission to search for

records that might be found at any of the TARGET LOCATIONS, in whatever form they are found.

One form in which the records might be found is data stored on a computer's hard drive or other storage

media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or,

potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

56.    *Probable cause.*  I submit that if a computer or storage medium is found at any of the

TARGET LOCATIONS, there is probable cause to believe those records will be stored on that computer

or storage medium, for at least the following reasons:

a.    Based on my knowledge, training, and experience, I know that computer files or

remnants of such files can be recovered months or even years after they have been

downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files

downloaded to a storage medium can be stored for years at little or no cost.  Even when

files have been deleted, they can be recovered months or years later using forensic tools.

This is so because when a person "deletes" a file on a computer, the data contained in the

file does not actually disappear; rather, that data remains on the storage medium until it is

overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

57.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium found at any of the TARGET LOCATIONS because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or

other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.   As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contains information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection

logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

58.   *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of the TARGET LOCATIONS for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the

warrant. In lieu of removing storage media from the TARGET LOCATIONS, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

      a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time at the TARGET LOCATIONS could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

      b.  Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

      c.  Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

      59.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the

warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

60.     Because several people share the SUBJECT PREMISES as a residence, it is possible that the SUBJECT PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## V.     <u>AUTHORIZATION REQUEST</u>

61.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41.

//

//

//

//

//

//

//

62.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

/s/
_____
Christopher Bailey
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Subscribed and sworn to me via telephone on:          November 20, 2020 at 11:21 am
_____
Hon. Carolyn K. Delaney
U.S. MAGISTRATE JUDGE

/s/ Adrian T. Kinsella
_____
Approved as to form by AUSA ADRIAN T. KINSELLA

AFFIDAVIT

21

## ATTACHMENT A-2

### Property to Be Searched





ATTACHMENT A-2



The SUBJECT PREMISES is located at 2000 Clay Bank Road #R7, Fairfield, California 94533.  The structure is a two-story, multiple-unit apartment building located inside the Avery Park apartment complex.  The structure is blue-grey in color with white trim and a brown shingle roof.  2000 Clay Bank Road is located on Clay Bank Road between E Tabor Avenue and Meadowlark Drive.  Building R is located adjacent to Clay Bank Road (pictured above).  Apartment R7 is located on the second floor above Apartment R3.  The front door faces Clay Bank Road and is maroon in color.  The number "7" is affixed to the trim around the door in white letters on a blue-grey background.

The premises to be searched include all rooms, attics, closed containers, and other places therein, the surrounding grounds, including storage areas, mailboxes, trash containers, out-

buildings, and sheds under the control of the occupant of the residence, which may contain any of the items of evidence described in Attachment B hereto.

This search shall include SUBJECT VEHICLES 1 through 3, detailed separately in Attachments A-3, A-4, and A-5) [Last sentence regarding other vehicles crossed out on agent's copy at CKD's direction.]

## ATTACHMENT B

### Particular Things to be Seized

All items constituting the evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 922(g)(1) (felon in possession of a firearm and/or ammunition) including, but not limited to, the following:

1. Firearms, ammunition, firearm parts, and/or any modification equipment and/or tools used to manufacture and/or modify firearms, accessories and other weapons.

2. All other items relating to the possession, maintenance and use of firearms, including ammunition magazines, speed loaders, ballistic vests, spare firearms parts, holsters, cleaning kits, and all other documentation that relates to the possession, sale or transfer of firearms, including but not limited to photographs, receipts for the purchase or repair of firearms, firearm containers, carrying cases, and firearm boxes.

3. Any boxes, bags, briefcases, suitcases or containers used to carry or conceal the items described in paragraphs 1, 2, and 3 of Attachment B.

4. Documents, items, and indicia tending to establish the identity of persons in control of the premises/vehicles and/or things described in the warrants, including utility bills, rent receipts, canceled checks, bank and other financial statements and records, deposit receipts, passports, driver's licenses, social security cards, mail, automobile titles, and other identification documents, land and lease titles, escrow papers, photographs, video and audio records, and keys;

5. Documents, photographs, video recordings, audio recordings, communications, items and other indicia evidencing the possession, theft, purchase, or sale of firearms.

6. Items tending to establish the identity of the person in control of the SUBJECT PREMISES, and any items seized from the SUBJECT PREMISES, to include utility company receipts, mortgage or rent receipts, canceled mail, envelopes, keys, telephone bills, charge card receipts/statements, lease-rental or sale agreements or contracts, gas receipts, notebooks, photographs, videos, savings account passbooks, passports, diaries, notebooks, vehicle registrations and titles, land titles, escrow papers, legal documents, medical records, weapons with serial numbers, and personal clothing including shoes, pants and shirts.

7. Photographs or videos stored and/or maintained in either hard-copy format or within

digital cameras, cellular telephones/smartphones, video recorders, computers or other electronic recording devices, where such images/videos depict the subjects of the investigation with co-conspirators and/or depict other evidence listed herein and/or evidence of the identified violations;

8. Any computer equipment or digital devices that are capable of being used to commit or further the crimes further described in the attached Affidavit, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes, including central processing units; laptop or notebook computers; tablets; wireless communication devices including cellular telephones and smartphones; portable electronic storage media; and security devices.

9. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

   a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. evidence of the lack of such malicious software;

   d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

   e. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

   f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the COMPUTER;

l. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m. contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law

enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

|  |  |
|---|---|
| In the Matter of the Search of ) | |
| ) | |
| 2000 CLAY BANK ROAD APARTMENT R7, FAIRFIELD, ) | Case No.   2:20-sw-1073 CKD |
| CALIFORNIA 94533 ) | |
| ) | SEALED |
| ) | |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A-2, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _____ 12/4/2020 _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: <u>any authorized U.S. Magistrate Judge in the Eastern District of California.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for   30   days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:     November 20, 2020 at 11:21 am          *Judge's signature*

City and state:     Sacramento, California          Carolyn K. Delaney, U.S. Magistrate Judge
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____          _____
Signature of Judge                                                                     Date